IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| SUSAN HARRISON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | Civil Action No: 7:06-cv-121-R |
| | § | |
| | § | |
| THE PROCTOR & GAMBLE CO., et al. | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE:

**Susan Harrison, William G. Harrison, III Individually and in his capacity as Trustee for the Harrison Family Trust; Cindy Nosseer, Kathy Allen, Pat Allen, Tina Harrison; W.G. Harrison, IV; Larry Luxenberg, John Shelton, and William G. Harrison, III in his capacity as Trustee for the Emily Waldrup Trust** ("Plaintiffs") file this First Amended Original Complaint complaining of **The Proctor & Gamble Company ("P&G"); Taft, Stettinius & Hollister LLP ("Taft Law Firm") and Thomas E. Grossman ("Grossman")** (collectively referred to as "Defendants") and for causes of action respectfully shows as follows:

### PARTIES

1.     Plaintiffs are former stockholders in Zooth, Inc. – a Texas Corporation (hereinafter "Zooth"). Zooth maintained its principal place of business in Wichita Falls, Wichita County, Texas. At the time the acts complained of herein occurred, the Plaintiffs were residents of various counties within the State of Texas including Wichita County.

2.     Defendant The Proctor & Gamble Company (hereinafter "P&G") is a corporation organized under the laws of the State of Ohio.  P&G does business worldwide, as well as here in Wichita County, Texas and has already entered an appearance in this litigation and may be served with this First Amended Original Complaint by serving its designated counsel of record herein.

3.     Defendant Thomas E. Grossman ("Grossman") is an individual who resides in the State of Ohio and has already entered an appearance in this litigation and may be served with this First Amended Original Complaint by serving its designated counsel of record herein.

4.     Defendant Taft, Stettinius & Hollister LLP is a Limited Liability Partnership organized under the laws of Ohio and has already entered an appearance in this litigation and may be served with this First Amended Original Complaint by serving its designated counsel of record herein.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter in that the Plaintiffs are citizens of the State of Texas and the Defendants, as set forth more specifically below, have maintained systematic and continuous contacts with the State of Texas or have committed torts against the Plaintiffs herein in the State of Texas and have otherwise made specific contacts with the State of Texas in connection with the claims made herein such that they have purposely availed themselves to the jurisdiction of the courts of this state and there are sufficient contacts by these Defendants for both specific and general jurisdiction so as to satisfy the requirements of the Due Process Clause of the United States Constitution.

6.      Wichita County is the county of proper venue in that all or a substantial portion of the events giving rise to this suit occurred in Wichita County, Texas.

## CONDITIONS PRECEDENT

7.      All conditions precedent to the filing of this suit have occurred, will be performed, have been waived or otherwise would be futile such that this suit is properly before this court.

## BACKGROUND FACTS

8.      The Plaintiffs are all former stockholders in Zooth which was founded by Plaintiff Susan Harrison in the early 1990's in Wichita Falls, Texas. Zooth started as a small, family run operation with a focus on designing and producing tooth brushes and related dental products for children. Over time, Zooth created strong alliances and licensing arrangements with a host of popular and recognizable children's' characters. By the year 2000, Zooth had built itself up to a position of being a leader in the children's' oral/dentistry market and had become highly regarded for its efficiencies, creativity and increasing market share.

9.      In the past, various representatives of Gillette, Inc. ("Gillette) a leading multi-national consumer products company had made overtures about their interest and desire to "do something" with Zooth. In the latter part of 2003, the stockholders of Zooth decided to test the market, and conversations with Gillette representatives were commenced. Ultimately, these conversations resulted in Gillette offering to purchase all of the outstanding shares of Zooth for the purpose of continuing to operate Zooth as an ongoing business enterprise.

10.      The Plaintiff stockholders retained Thomas E. Grossman and his firm –

**Plaintiffs' First Amended Original Complaint**

the Taft Law Firm – to represent their interests.  Mr. Grossman and other lawyers of the Taft Law Firm visited Texas on a number of occasions in the course of representing Plaintiffs. They communicated constantly with stockholders located in Wichita Falls and performed legal services within and throughout the State of Texas in connection with the Zooth/Gillette transaction.

11.    Among other responsibilities, Mr. Grossman and the Taft Law Firm had the duty to make sure that all of the Plaintiffs' interests were being addressed and to ensure that all reasonable and prudent measures were undertaken for such a transaction. The final agreement that was negotiated by Grossman and the Taft Law Firm provided that, in exchange for their shares in Zooth, the Plaintiffs would receive approximately $28 million dollars up front and, depending on the future performance of Zooth, Plaintiffs could earn up to an additional $12 million subsequent to the closing of the transaction.

12.    The transaction closed on or about June 4, 2004 and a Stock Purchase Agreement (the "Contract") was executed on that date.  On or about November 1, 2004, just five months after this sale closed, Gillette announced that it was going to be acquired by P&G.  From that point on, the nature of the future performance capabilities of Gillette was altered and diminished and it became impossible for Gillette to fully perform its duties under the contract.   Upon taking control of Gillette, P&G, not a party to the Contract, engaged in numerous acts designed to frustrate and otherwise impede Gillette from fully reaching its performance goals under the Contract.   P&G closed its merger with Gillette on or about October 1, 2005.

13.    Plaintiffs bring this suit against P&G on account of its unjustified and unlawful actions in interfering with and preventing Gillette and Plaintiffs from

**Plaintiffs' First Amended Original Complaint**

performing under the Contract and otherwise interfering with Plaintiffs' existing contract and/or business relationship with Gillette. Plaintiffs also bring this suit against Grossman and the Taft Law Firm on account of the lawyers' failure to act as reasonably prudent lawyers in failing to undertake appropriate measures to address and ensure that Plaintiffs' interests would be adequately protected in the event of a change in control of Gillette or in the event that Gillette acted to prevent Plaintiffs from earning the additional compensation due them pursuant to the terms of the Contract. The Defendants should be held jointly and severally liable to the Plaintiffs for the damages which have been sustained by the Plaintiffs.

## CAUSES OF ACTION

### A.    *Tortious Interference with Contract and Existing Business Relationship by P&G.*

14.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 13.

15.    A contract had been executed by and between the Plaintiffs and Gillette. In addition, as a result of the contract, the Plaintiffs and Gillette had an existing and continuing business relationship.

16.    Among other things, the Contract provided that the Plaintiffs would receive additional, significant sums which were predicated on and as a percentage of the continuing and future performance of Gillette with regard to marketing and selling Zooth products and design portfolio products as defined in the Contract. The bulk of this revenue was to be generated in the three year period after the June 4, 2004 closing date. Gillette was contractually obligated to act in all commercially reasonable ways to facilitate and achieve these performance based incentives and had promised the Plaintiffs

that it would do so. Among other things, the Contract provided the following –

"<u>Minimum Earnout Balance</u>" means the amount, if any, by which $3 million exceeds the aggregate total of all Deferred Consideration paid by Buyer pursuant to this Agreement.

\*\*\*\*

2.      PURCHASE AND SALE OF SHARES

\*\*\*\*

2.2     <u>Purchase Price</u>.

2.1.1   <u>Purchase Price</u>. The aggregate consideration for the Shares will be the sum of $27,815,000 plus the Deferred Consideration paid to the Sellers (collectively, the "Purchase Price"), payable as described below. The Purchase Price will be subject to adjustment as provided in Sections 2.5 and Section 10.

(a) <u>Closing Date Consideration</u>. On the Closing Date, Buyer will pay $27, 815, 000 to be distributed according to Section 2.4.

(b) <u>Deferred Consideration</u>.   Buyer will pay deferred cash consideration equal to 4% per annum of Net Sales of Zooth Branded Products ("<u>ZBP Deferred Consideration</u>") plus 4% per annum of Net Sales of Design Portfolio Products (the "DPP Deferred Consideration" and, together with the ZBP Deferred Consideration, the "Deferred Consideration"). Buyer will pay (i) ZBP Deferred Consideration during the three-year period beginning on January 1, 2005 and ending on December 31, 2007 and (ii) DPP Deferred Consideration during the period beginning on the later of (x) January 1, 2005 and (y) the date on which the first Design Portfolio Products are shipped by Buyer or any of its Subsidiaries to a customer (the "<u>Initial DPP Ship Date</u>") and ending on the third anniversary of such later date (such ending date, the "<u>DPP Consideration Termination Date</u>"); *provided, however*, that neither Buyer nor any of its Subsidiaries (nor any of their respective successors or assigns) will have any obligation whatsoever to pay any DPP Deferred Consideration pursuant to this Agreement or otherwise, and this Section 2.2.1 (b) will terminate and be of no further force or effect, if the Initial DPP Ship Date does not occur on or before June 4, 2009.

\*\*\*

Notwithstanding any provision of this Agreement to the contrary, in no event will Buyer or any of its Subsidiaries (or any of their respective successors or assigns) be required to pay Deferred Consideration under this Agreement or otherwise in an amount that is greater that $12 million in the aggregate. At such time, if any, that Buyer and/or its Subsidiaries has paid Deferred Consideration under this Agreement totaling $12 million in the aggregate, neither Buyer nor any of its Subsidiaries (nor any of their respective successor or assigns) will have any further obligation to pay any Deferred Consideration and this Section 2.2.1(b) will terminate immediately and be of no further force or effect.

\*\*\*

17.     Upon announcing its takeover of Gillette and its assumption of Gillette operations, P&G unlawfully and without justification undertook to interfere with and otherwise prevent Gillette and/or Zooth from fully performing under the Contract and/or to breach same, and thereby proximately damaging the Plaintiffs. P&G's actions as described more fully below, were done willfully and intentionally and in bad faith, and such actions are a proximate cause of damages to the Plaintiffs. At all times material, P&G had knowledge of the terms and conditions of the contract and the business relationship between the Plaintiffs and Gillette. Among other things, P&G interfered with disrupted the marketing of Zooth products and Gillette's efforts to expand and continue to develop Zooth's products and markets, and Zooth's stability in the marketplace and Zooth's employment of key employees.

18.     In taking over Gillette, P&G took actions and made Gillette take actions which resulted in the diminished performance of Zooth, and commenced a complete dismantling of Zooth for all intents and purposes. Many of Gillette's key management personnel involved in Zooth were dismissed or transferred – and not replaced. Likewise,

**Plaintiffs' First Amended Original Complaint**

many of Zooth's key employees were dismissed or transferred – and not replaced. The primary marketing and advertising employees were not replaced and the marketing staff of Zooth was reduced by 75%. Consequently, there was a dramatic reduction in marketing and advertising activities. The principal person in charge of licensing a principal component of Zooth's revenue was also terminated.

19.     In addition, all plans for Zooth to acquire additional companies which would expand its revenue base were scrapped, and plans to utilize Gillette's market penetration and contracts in markets previously not tapped by Zooth were also abandoned. When Gillette purchased Zooth, the original plan was for Zooth to remain in Wichita Falls so that it could capitalize on its size and ability to adapt, and also to ensure that many of its key employees and personnel would be able to remain with Zooth. When P&G took over, employees were told (the ones not dismissed or transferred) that they would have to relocate to Cincinnati, Ohio. This resulted in further abandonment of the Zooth model.

20.     In addition, P&G requires that Zooth utilize a different and more restrictive licensing (at a lower percentage rate) agreement program than the one previously utilized by Zooth, leading to a decline in revenue for its products. P&G also had Susan Harrison, the main former Zooth principal, working on projects outside of the contractual Zooth revenue model, thereby further diminishing Zooth's revenue stream upon which the Plaintiffs were to be paid. Moreover, Zooth's website presence has been virtually eliminated. Where it once was prominently featured in Gillette's line of businesses, it is virtually impossible to locate any mention or reference to Zooth in P&G's current website. Upon information and belief, Zooth has now shut down

**Plaintiffs' First Amended Original Complaint**

operations in Wichita Falls and is being operated by only a skeleton team even though the three year contractual period is ongoing.

21.     All of this activity has led to a decrease in revenue to the Plaintiffs – far below the $12 million that should have been achieved. All of these activities occurred at P&G's direction or were done directly by P&G itself. P&G was well aware of Gillette's obligations to run Zooth in a manner that would allow it to achieve its maximum revenue potential so as to enable the Plaintiffs to receive the $12 million amount over the approximate three year period. Despite this knowledge, P&G knowingly, willfully and intentionally engaged in its own conduct and/or induced, directed or otherwise caused Gillette to engage in these activities and other activities purposely designed to prevent the Plaintiffs from receiving the $12 million dollar amount.

22.     The aforesaid acts and omissions, when viewed objectively, involved an extreme likelihood of economic injury to Plaintiffs which P&G subjectively knew or should have known would occur. Nevertheless, P&G proceeded to act willfully and intentionally with regard to the rights of Plaintiffs such that the Plaintiffs are entitled to an award of exemplary damages against P&G.

**B.     *Negligence against Grossman and the Taft Law Firm.***

23.     Grossman and various Taft Law Firm members and lawyers personally delivered or purported to deliver legal representation, services and counsel to Plaintiffs in their individual capacity and as members of the Taft Law Firm. The Taft Law Firm is liable for its own actions in this case and by the theory of respondeat superior on account of the negligent acts of Mr. Grossman and its other employees who acted in this transaction. These Defendants accordingly owed a duty to Plaintiff to properly and

competently provide legal representation, services and counsel to Plaintiffs.

24.     During the relevant time period, these Defendants committed one or more of the following acts or omissions, which amounted to an act and/or omission which a reasonably prudent law firm would not have done in the same or similar circumstances, proximately causing the occurrences, injuries, and damages complained of herein including but not limited to failing to conduct a thorough due diligence effort, failing to negotiate and draft a proper contract, failing to disclose potential conflicts of interest and failing to otherwise protect the interests of the Plaintiffs.

25.     Plaintiffs are entitled to recover from Defendants all actual damages occasioned by their negligence both jointly and severally.

## DAMAGES

26.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 25.

27.     As a direct and proximate cause or result of the tortious conduct described herein, the Plaintiffs have incurred the following damages which they seek to recover jointly and severally from the Defendants, including but not limited to:

      A.     All actual economic damages sustained by them as a result of the Defendants' tortious interference and/or negligence;

      B.     Exemplary Damages due to P&G's willful and intentional misconduct;

      C.     A disgorgement of all fees that they have been paid to the Taft Law Firm as well as all actual damages occasioned by their conduct.

## JURY TRIAL

28.     Trial by jury is demanded.

**Plaintiffs' First Amended Original Complaint**

## PRAYER

*For the reasons stated above,* Plaintiffs request that Defendants be cited to appear and answer, and at final trial, that they be found jointly and severally liable and that judgment be entered in the Plaintiffs' favor awarding the following:

      (a)    Judgment against Defendants, jointly and severally for Plaintiffs' actual damages in an amount within the minimal jurisdictional limits of this Court;

      (b)    Judgment against Defendant P&G for exemplary or punitive damages without limitation, in a sum to be determined by the trier of fact;

      (c)    Pre-judgment interest at the highest legal rate allowed by law;

      (d)    Post-judgment interest at the highest legal rate allowed by law; and

      (e)    Such other and further relief at law or in equity, to which Plaintiffs may show themselves to be justly entitled.

**CHAIKEN & CHAIKEN, P.C.**

Robert L. Chaiken
State Bar No. 04057830
Kenneth B. Chaiken
State Bar No. 04057800
One Galleria Tower
13355 Noel Road, Suite 600
Dallas, Texas 75240
Telephone: (214)265-0250
Telecopy: (214)265-1537

**ATTORNEYSFOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served via electronic filing and U.S. mail upon below counsel of record on this 28th day of February, 2007.

Steve Briley
Banner Briley & White, LLP
4245 Kemp Blvd.
Suite 200
Bank One Tower
Wichita Falls, TX 76308

D. Jeffrey Ireland
Faruki, Ireland & Cox, P.L.L.
500 Courthouse Plaza, S.W.
109 North Ludlow Street
Dayton, OH 45402

George M. Kryder
Vinson & Elkins
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975

_____
Robert L. Chaiken

**Plaintiffs' First Amended Original Complaint**